# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF TEXAS
# HOUSTON DIVISION

LOIS LAVERNE CHANDLER            §
CHILDRESS                        §
        Plaintiff,             §
                                §
v.                               §      CIVIL ACTION NO.  4:16-CV-00795
                                §
NANCY A. BERRYHILL, ACTING       §
COMMISSIONER OF THE SOCIAL       §
SECURITY ADMINISTRATION,         §
        Defendant.             §

## MEMORANDUM AND ORDER ON
## MOTIONS FOR SUMMARY JUDGMENT

On September 8, 2017, the parties consented to proceed before a United States magistrate judge for all purposes, including the entry of a final judgment, under 28 U.S.C. § 636(c). (Docket Entry #17). The case was then transferred to this court. (Docket Entry #18). Cross-motions for summary judgment have been filed by Plaintiff Lois Laverne Chandler Childress ("Plaintiff," "Childress") and by Defendant Nancy A. Berryhill ("Defendant," "Commissioner"), in her capacity as Acting Commissioner of the Social Security Administration ("SSA"). (Plaintiff's Motion for Summary Judgment and Memorandum ["Plaintiff's Motion"], Docket Entry No. 11, 12; Defendant's Motion for Summary Judgment ["Defendant's Motion"], Docket Entry No. 13). Defendant has also filed a response to Plaintiff's Motion. (Defendant's Response in Opposition to Plaintiff's Motion for Summary Judgment ["Defendant's Response"], Docket Entry No. 16). After considering the pleadings, the evidence submitted, and the applicable law, the court ORDERS that Plaintiff's Motion be **GRANTED**, and that Defendant's Motion be **DENIED**.

*Background*

On August 17, 2012, Plaintiff Lois Laverne Chandler Childress filed an application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act ("the Act"), and under Part A of Title XVIII of the Act. (Tr. at 321-322). In her application, Childress claimed that she has been disabled since January 1, 2010. (Tr. at 359). As part of the application, she said that she stopped working on April 24, 2010, when she left her job at Pet City because of anxiety and stress, and because she could not lift the dogs onto the grooming tables. (Tr. at 352-358). She also claimed to be suffering from back pain, migraine headaches, pain in weight bearing joints, fibromyalgia, chronic obstructive pulmonary disease ("COPD"), high blood pressure, depression, anxiety, and stomach problems. (Tr. at 362). On February 5, 2013, the Commissioner denied her application for benefits. (Tr. at 159). Plaintiff petitioned for a reconsideration of that decision, contending that she was unable to carry heavy objects, hold things in her hand, remember things, or stand for long periods of time because of back pain, leg pain and fibromyalgia. Her claims were again denied on May 14, 2013. (Tr. at 178, 190, 418). Plaintiff then successfully requested a hearing before an administrative law judge ("ALJ"). (Tr. at 194-195). On February 5, 2014, Plaintiff appeared with her attorney, Ashley Coleman, and testified before the ALJ, David R. Gutierrez ("ALJ" or "ALJ Gutierrez"). (Tr. at 87-116). In addition to Childress, the ALJ heard testimony from Dorado D. Brooks, M.D. ("Dr. Brooks"), a medical expert witness, by telephone.[1] (Tr. at 105-112). Susan Rapant ("Ms. Rapant"), a vocational expert witness, also testified. (Tr. at 112-116). For an unexplained reason, ALJ Gutierrez held a second hearing on July 22, 2014.[2] (Tr. at 118). Plaintiff was represented by a different attorney from the same firm, Angela Richard, and she testified at this hearing as well.

---

[1] ALJ Gutierrez requested telephone testimony from Dr. Durado Brooks. (Tr. at 226). Dr. Brooks is referred to as "Dr. Burke" throughout the transcript of the hearing, and by the parties in their briefing.

[2] There is no explanation in the transcript for why that second hearing took place.

(Tr. at 119-131). Phillip Bentlif, M.D. ("Dr. Bentlif"), a medical expert witness, testified in person at this hearing, as did Kay Squires Gilreath ("Ms. Gilreath"), a vocational expert witness. (Tr. at 131-144).

Following the July 2014 hearing, the ALJ engaged in the following five-step, sequential analysis to determine whether Plaintiff was capable of performing substantial gainful activity or was, in fact, disabled:

1. An individual who is working or engaging in substantial gainful activity will not be found disabled regardless of the medical findings. 20 C.F.R §§ 404.1520(b) and 416.920(b).

2. An individual who does not have a "severe impairment" will not be found to be disabled. 20 C.F.R. §§ 404.1520(c) and 416.920(c).

3. An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors. 20 C.F.R. §§ 404.1520(d) and 416.920(d).

4. If an individual is capable of performing work she has done in the past, a finding of "not disabled" must be made. 20 C.F.R. §§ 404.1520(f) and 416.920(f).

5. If an individual's impairment precludes performance of her past work, then other factors, including age, education, past work experience, and residual functional capacity must be considered to determine if any work can be performed. 20 C.F.R. §§ 404.1520(g) and 416.920(g).

*Newton v. Apfel*, 209 F.3d 448, 453 (5th Cir. 2000); *Martinez v. Chater*, 64 F.3d 172, 173-74 (5th Cir. 1995); *Muse v. Sullivan*, 925 F.2d 785, 789 (5th Cir. 1991); *Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991); *Harrell v. Bowen*, 862 F.2d 471, 475 (5th Cir. 1988). It is well-settled, under this analysis, that Childress has the burden to prove any disability that is relevant to the first four steps. *See Wren*, 925 F.2d at 125. If she is successful, the burden then shifts to the Commissioner, at step five, to show that she is able to perform other work that exists in the national economy. *See Myers v. Apfel*, 238 F.3d 617, 619 (5th Cir. 2001); *Wren*, 925 F.2d at 125.

"A finding that a claimant is disabled or is not disabled at any point in the five-step review is conclusive and terminates the analysis." *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

It must be emphasized that the mere presence of an impairment does not necessarily establish a disability. *See Anthony v. Sullivan*, 954 F.2d 289, 293 (5th Cir. 1992) (quoting *Milam v. Bowen*, 782 F.2d 1284, 1286 (5th Cir. 1986)). An individual claiming disability insurance benefits under the Act has the burden to prove that he suffers from a disability. *See Johnson v. Bowen*, 864 F.2d 340, 343 (5th Cir. 1988); *Cook v. Heckler*, 750 F.2d 391, 393 (5th Cir. 1985). Under the Act, a claimant is deemed disabled only if he demonstrates an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of not less than twelve months." *Selders v. Sullivan*, 914 F.2d 614, 618 (5th Cir. 1990) (citing 42 U.S.C. § 423(d)(1)(A)). Substantial gainful activity is defined as "work activity involving significant physical or mental abilities for pay or profit." *Newton*, 209 F.3d at 452. A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." *Hames v. Heckler*, 707 F.2d 162, 165 (5th Cir. 1983) (citing 42 U.S.C. § 423(d)(3)). Further, the impairment must be so severe as to limit the claimant so that "[s]he is not only unable to do his previous work but cannot, considering [her] age, education, and work experience, engage in any kind of substantial gainful work which exists in the national economy." *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994) (citing 42 U.S.C. § 423(d)(2)(A)).

Based on these principles, as well as his review of the evidence presented at the hearing, the ALJ found that Childress suffers from the following severe impairments: "degenerative disc

disease, osteoarthritis[3] of the right knee, fibromyalgia, chronic obstructive pulmonary disease (COPD), migraines, hypothyroidism, irritable bowel syndrome, depression, anxiety, and personality disorder." (Tr. at 58). Although he determined that these impairments are severe, he concluded, ultimately, that they do not meet, or equal in severity, the medical criteria for any disability impairment in the applicable SSA regulations. (*Id.*).

The ALJ then assessed Childress's residual functional capacity, and concluded that she is capable of performing "light work," as defined in 20 CFR 404.1567(b) with the following limitations:

> "she must have the ability to ambulate with a cane; she is able to frequently, as opposed to constantly, reach in all directions, handle, finger and feel bilaterally because of fibromyalgia; occasionally climb ramps, stairs, ladders, ropes or scaffolds, balance, stoop, kneel, crouch and crawl; she must avoid exposure to extreme cold, fumes, dust, irritants, gases and poorly ventilated areas; she must avoid more than occasional exposure to moving machinery, unprotected heights and open flames; she must avoid loud noise and vibrations because of migraines; she is able to perform simple, unskilled work with little or no vocational training; she must work in an environment free of fast pace production requirements requiring only occasional decision making requirements and changes in the work setting with no tandem or teamwork because the treating physician stated that her irritable bowel syndrome could handle low stress work; she must avoid more than occasional interaction with co-workers and the public, meaning brief, infrequent and superficial and she is able to respond to changes in a routine work setting and maintain attention for two hour periods. (Tr. at 61-62).

With those limitations, the ALJ determined that Childress is capable of working as a mail clerk, an office helper, and a photo copy machine operator. He also found that these jobs exist in significant numbers in the national and local economies. (Tr. at 21-28). For that reason, on August 27, 2014, the ALJ denied Childress's application, finding that she was not disabled under the Act. (Tr. at 71).

---

[3] "Osteoarthritis" is a non-inflammatory form of arthritis in which one or many joints undergo degenerative changes. MOSBY'S MEDICAL, NURSING, & ALLIED HEALTH DICTIONARY, 1165 (5th ed. 1998).

On October 2, 2014, Childress requested an Appeals Council review of the ALJ's decision. (Tr. at 52). SSA regulations provide that the Appeals Council will grant a request for a review if any of the following circumstances is present: "(1) there is an apparent abuse of discretion by the ALJ; (2) an error of law has been made; (3) the ALJ's action, findings, or conclusions are not supported by substantial evidence; or (4) there is a broad policy issue which may affect the public interest." 20 C.F.R. §§ 404.970 and 416.1470. On February 8, 2016, the Appeals Council denied Plaintiff's request, finding that no applicable reason for review existed. (Tr. at 1-3). With that ruling, the ALJ's findings became final. *See* 20 C.F.R. §§ 404.984(b)(2) and 416.1484(b)(2). On March 23, 2016, Childress filed this suit, pursuant to section 205(g) of the Act (codified as amended at 42 U.S.C. § 405(g)), to challenge that decision. (Plaintiff's Original Complaint ["Complaint"], Docket Entry #1). Subsequently, the parties filed cross-motions for summary judgment.

### Standard of Review

Federal courts review the Commissioner's denial of disability benefits only to ascertain whether the final decision is supported by substantial evidence and whether the proper legal standards were applied. *See Newton*, 209 F.3d at 452 (citing *Brown v. Apfel*, 192 F.3d 492, 496 (5th Cir. 1999)). "If the Commissioner's findings are supported by substantial evidence, they must be affirmed." *Id.* (citing *Martinez*, 64 F.3d at 173). "Substantial evidence is such relevant evidence as a reasonable mind might accept to support a conclusion. It is more than a mere scintilla and less than a preponderance." *Ripley v. Chater*, 67 F.3d 552, 555 (5th Cir. 1995); *see Martinez*, 64 F.3d at 173 (quoting *Villa v. Sullivan*, 895 F.2d 1019, 1021-22 (5th Cir. 1990)). On review, the court does not "reweigh the evidence, but . . . only scrutinize[s] the record to determine whether it contains substantial evidence to support the Commissioner's decision." *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995); *see Fraga v. Bowen*, 810 F.2d 1296, 1302

(5th Cir. 1987). If no credible evidentiary choices or medical findings that support the Commissioner's decision exist, then a finding of no substantial evidence is proper. *See Johnson*, 864 F.2d at 343.

### *Discussion*

Childress challenges the ALJ's decision because he allegedly failed "altogether to discuss, acknowledge or assign any weight to the opinion testimony of medical expert [Dr. Brooks]." (Plaintiff's Motion at 4). Plaintiff insists that Dr. Brooks placed her at a sedentary level of work, and, because of her age, she was disabled, as a matter of law. (Plaintiff's Motion at 4-5). In addition to ignoring Dr. Brooks' opinion, Plaintiff argues that the ALJ failed to accord the proper weight to the opinion from her treating physician, Dr. Harrell, who also determined that she was limited to sedentary work. (Plaintiff's Motion at 7). Defendant, however, maintains that the ALJ properly considered all of the available evidence, and followed the applicable law. The Commissioner contends that any errors the ALJ committed were harmless. (Defendant's Motion at 4-12).

### *Medical Facts, Opinions, and Diagnoses*

Childress's earliest medical record is from February 22, 2008, when she switched doctors and began treatment under Dr. Hyunmo Koo, M.D. ("Dr. Koo"), at the Kelsey-Seybold Clinic. (Tr. at 1229). Even though Plaintiff was taking medication for hypertension, her blood pressure had been elevated for more than two weeks. (Tr. at 1229). She also complained of nausea and numbness and tingling in her left arm which had begun three days earlier. (*Id.*). She told Dr. Koo that she suffered from COPD, hypothyroidism, hypertension, and depression, and was taking amiloride for high blood pressure, and Prozac for depression. (*Id.*). The results of Dr. Koo's physical examination was normal. She exhibited no symptoms of depression, was in no respiratory distress, and had a normal range of motion and reflexes in all joints. (Tr. at 1229).

An echocardiogram showed no cardiac problems. (Tr. at 1230, 1232-1233). Dr. Koo prescribed Norvasc, to better control her hypertension, and instructed her to return for a stress test if the tingling in her left arm returned. (Tr. at 1234).

Two days later, Plaintiff went to the emergency room at St. Luke's Community Medical Center complaining of chest pain, shortness of breath, and high blood pressure. (Tr. at 1160). She said that she had a burning pain in her chest that radiated to her back, and it had worsened over the last two weeks. A nuclear stress test did not show any heart damage, and she was diagnosed as suffering from an aggravation of gastroesophageal reflux disease ("GERD"). She told the doctor that she had been taking increased doses of Advil for "migraine headaches," and the doctor believed that may have aggravated her GERD. (Tr. at 1172). She was discharged with instructions to maintain a low salt, low fat diet, and was prescribed Fioricet for migraine headaches.[4] (Tr. at 1171). On March 3, 2008, Plaintiff had several tests, including a colonoscopy, to determine if there was damage to her gastrointestinal tract which was causing her abdominal pain, nausea and vomiting. (Tr. at 456). Although there were some signs of mild inflammation in her stomach and intestinal tract, there were no signs of reflux during the tests. (Tr. at 456).

Childress saw Dr. Koo on April 14, 2008, to monitor her high blood pressure. (Tr. at 1235). She complained that she was always fatigued, and had occasional tension headaches. (Tr. at 1235). Her physical examination was normal, except for the headaches, but blood and urine tests were abnormal. (Tr. at 1235-1236). An ultrasound of her kidneys was normal, but, did show that Plaintiff had an ovarian cyst. (Tr. at 1239). She was given Midrin for the headaches, and prescribed Macrobid for a possible urinary tract infection. (Tr. at 1240).

---

[4] Plaintiff was also taking synthroid, Prozac, ameloride and Norvasc to treat the conditions of hypothyroidism, anxiety, and high blood pressure. (Tr. at 1171).

Plaintiff saw Dr. Koo again on May 2, 2008, because she still had abdominal pain following the colonoscopy. (Tr. at 1241). A physical examination was essentially normal, as she displayed no problems in breathing, and she had a normal range of motion, and normal reflexes in her extremities. (Tr. at 1242). Dr. Koo believed that she suffered from irritable bowel syndrome and he prescribed hyoscyamine. (Tr. at 1242).

On October 9, 2008, Plaintiff returned to the Kelsey-Seybold Clinic and was treated by Sebastian Scobercea, M.D. ("Dr. Scobercea"), a primary care physician. She told Dr. Scobercea that she had suffered from recurring headaches for the past year. (Tr. at 1248). She had recently stopped taking Prozac, and the headaches had become worse. (Tr. at 1248) During the most recent headache, the left side of her face was numb and her left eyelid drooped slightly, and she had pain in front of her ear. (Tr. at 1248). She told Dr. Scobercea that her high blood pressure caused some of the headaches, but that she did not suffer from dizziness or shortness of breath. (Tr. at 1249). Childress also told him that her depression had become worse since the Prozac was stopped, and she wanted to resume taking that medication. (Tr. at 1249). During the physical examination, Dr. Scobercea observed swelling in her legs, which he believed was a side effect of the Norvasc that she was taking for her high blood pressure. (Tr. at 1249). Dr. Scobercea ordered an MRI of her head. (Tr. at 1248). That test was normal for structural defects, but Plaintiff did have a mild sinus infection and so he prescribed an oral antibiotic. (Tr. at 1248). Dr. Scobercea diagnosed her as suffering from hypertension, migraine headaches, depression, tempo mandibular joint syndrome ("TMJ syndrome"), pedal edema, and numbness in her face. (Tr. at 1251). He also reported that she had been previously treated for COPD and hypothyroidism. (Tr. at 1251). He resumed the Prozac, and prescribed Lyrica for the TMJ syndrome. (Tr. at 1250). Approximately one-and-a-half weeks later, on October 20, 2008, Plaintiff experienced nausea and repeated episodes of vomiting. (Tr. at 1257). Dr. Scobercea

9

diagnosed gastroenteritis and told her to rest and drink fluids. (Tr. at 1258). He treated her for the flu in December, 2008. (Tr. at 1270).

Plaintiff's nausea, vomiting, and abdominal pain returned on January 29, 2009. (Tr. at 1275). She told Dr. Scobercea that she also had a dry cough, but no chest pain, fever or shortness of breath. (Tr. at 1276). Dr. Scobercea prescribed an antibiotic for her vomiting and diarrhea, Combivent to treat her COPD, and referred her for an evaluation for surgery to repair a suspected hiatal hernia.[5] He also noted that some of her gastric distress might be caused by a gastric band that she had previously received. (Tr. at 1281). One week later, Childress returned to Dr. Scobercea because she had a "severe" headache, was sensitive to light, and was experiencing nausea. (Tr. at 1283). She complained of pain radiating into the right side of her neck. She was given an injection of Toradol to relieve the immediate pain, and prescribed Fioricet. (Tr. at 1284).

On February 17, 2009, Plaintiff was treated by Dr. Scobercea for a sore throat, headache, and pain at the base of her skull and neck. (Tr. at 1289). She said that, although the neck pain did not radiate into her arms, she did have numbness, tingling and weakness in her left arm. (Tr. at 1289). She told Dr. Scobercea that she had tried a Medrol Dose Pak, but it did not provide any relief.[6] X-rays of the cervical spine showed moderate degenerative changes and moderate loss of disc height at C6-7, as well as mild loss of disc height at C5-6. (Tr. at 1294). She was prescribed Lyrica and told to schedule an appointment at the Spine Center. (Tr. at 1296). Nine days later, on February 26, 2009, Plaintiff was treated for an upper respiratory infection. (Tr. at 1296). She was coughing, but did not have any difficulty in breathing. (Tr. at 1297). She was prescribed a course of antibiotics. (Tr. at 1302). On March 12, 2009, Plaintiff saw Dr.

---

[5] A hiatal hernia occurs when the stomach pushes through a hole in the diaphragm into the chest cavity.
[6] Medrol Dose Pak is an oral steroidal treatment usually used to treat an inflammatory condition such as arthritis, lupus, and psoriasis. There is no record of this treatment.

Scobercea again for an upper respiratory infection. (Tr. at 1302). She had a fever, was congested and was coughing. (Tr. at 1302). She was treated with a different antibiotic, and instructed to continue to use Combivent, as needed, for her COPD. (Tr. at 1303).

On May 26, 2009, Childress returned to Dr. Scobercea due to ongoing fevers, night sweats, and weight loss. (Tr. at 1309). Plaintiff told Dr. Scobercea that her fibromyalgia was "not well controlled," but a rheumatologist had just prescribed Cymbalta and had increased her dosage of Lyrica. (Tr. at 1309). Chest x-rays showed mild pneumonia in the right lung, and she was prescribed an antibiotic and instructed to follow up in two weeks. (Tr. at 1311). Dr. Scobercea also told her to see a general surgeon for her recurring nausea and vomiting. (Tr. at 1309). Plaintiff then saw Dr. Vadim Sherman ("Dr. Sherman"), for these symptoms. Dr. Sherman ordered an upper GI study on July 15, 2009, but that test showed only minor swelling around the esophagus. (Tr. at 509, 1157). The study also showed no evidence of gastroesophageal reflux or a hiatal hernia, although it did reveal a three centimeter adrenal lesion. (Tr. at 502-503, 1157). According to the medical records, Dr. Sherman recommended that Plaintiff have surgery to remove or revise the gastric band, as he believed it was causing her nausea. That request was initially denied by her health insurer. (Tr. at 1319, 1007).

Childress was then admitted to St. Luke's Hospital, on August 15, 2009, when her chronic nausea and vomiting worsened, and she became feverish with abdominal pain. (Tr. at 1101). She complained of shortness of breath, with severe chest pain, and said that she had fainted twice. (Tr. at 484-485). She described to the doctors a past medical history that included COPD, hiatal hernia, diverticulitis, high blood pressure, thyroid disease, herniated cervical disc, fibromyalgia, depression, and anxiety. (Tr. at 1135). She was diagnosed with gastritis and dehydration, and given intravenous fluids. She was discharged on the second day. (Tr. at 1101). Dr. Susan S. Brown believed that the blood pressure medication Plaintiff was taking caused her

to become dehydrated and contributed to the nausea and vomiting, so she instructed Childress to stop taking that medication. Plaintiff was also told to follow up with Dr. Scobercea within a week. (Tr. at 1102).

She saw Dr. Scobercea on August 19, 2009. (Tr. at 1319). He noted that Childress had lost almost thirty pounds over the past several months because of her nausea and vomiting. Plaintiff told the doctor that her rheumatologist had changed her medications for fibromyalgia, and she now took Savella in place of Cymbalta. (Tr. at 1320). Childress complained that the new medication did not control her joint aches and pains any better, and her depression was worse with Savella. (Tr. at 1320). A physical examination was generally normal, but she did show signs of joint pain, and a depressed mood. (Tr. at 1320-1321). She returned to Dr. Scobercea's office on August 26, 2009, because she had begun running a fever at night again, and still had nausea and vomiting. (Tr. at 1330). She was coughing, but did not have any breathing difficulty. (Tr. at 1331). Blood tests revealed that she was mildly anemic. (Tr. at 1331). X-rays of the chest were normal, and her lungs were clear, but mild degenerative changes in the thoracic spine were present. (Tr. at 1339). The doctor was unable to explain her night fevers, and told her to go to the emergency room if they continued. (Tr. at 1341).

Plaintiff suffered from a respiratory infection that caused congestion and a sore throat on September 22, 2009. (Tr. at 1342). Dr. Scobercea told her to rest, drink fluids, and take Tylenol as needed. (Tr. at 1344). On October 12, 2009, she had a sinus infection, and she complained of a cough, tightness in her chest, and shortness of breath. (Tr. at 1350). Dr. Scobercea prescribed a course of antibiotics, and told her to use her Combivent inhaler as needed. (Tr. at 1350). Dr. Sherman saw her on October 28, 2009, and she continued to complain of nausea and vomiting. (Tr. at 1011). He again recommended removal or revision of the gastric band. (Tr. at 1011).

A friend took Childress to the emergency room at St. Luke's Hospital, the Woodlands, on November 21, 2009, because she was very lethargic all day. (Tr. at 1066). She complained of severe chest pain, and believed she might be having a stroke because she was dizzy, had blurred vision, and was drooling. (Tr. at 1066). The triage nurse pointed out that Plaintiff had equal strength in both hands, did not have a facial droop or slurred speech, and was able to search for items in her purse without difficulty, during the initial assessment. (Tr. at 1066). An hour later, when she was examined again, Childress was asleep and could not be roused, so the doctor gave her a shot of narcan to wake her up. (Tr. at 1067). She was lethargic, unable to walk on her own, slurring her speech and disoriented, but no longer in pain. (Tr. at 1067). A CT of the brain was negative for a stroke, and an EKG of the heart was normal. (Tr. at 1068-1069). The doctor believed that she had accidentally overdosed on the medications she was taking for fibromyalgia and her back pain, because her symptoms improved after the narcan was administered. (Tr. at 1070). She was discharged and told to follow up with her family doctor the next day. (Tr. at 1075).

Plaintiff went to Kingwood Medical Center on December 7, 2009, because of chest pain and fevers. (Tr. at 517-520). She was diagnosed with bilateral pneumonia, and blood tests showed that she was anemic. (Tr. at 517). Howard Hamat, M.D., diagnosed her as suffering from a chronic iron deficiency that was probably "nutritional in nature." (Tr. at 517). He believed the gastric band was causing nausea and vomiting, and contributing to the anemia. (Tr. at 517).

On December 16, 2009, while still waiting for approval for the gastric band removal, Plaintiff sought treatment from Dr. Sherman for the adrenal cyst that had been discovered earlier in the year. (Tr. at 1013). She was referred to an endocrinologist for further tests. (Tr. at 1073). Plaintiff then went to the Rheumatology Clinic at the Kelsey-Seybold Clinic on February 3,

2010. (Tr. at 1357). Dr. Sheila Albuquerque ("Dr. Albuquerque") noted Plaintiff's history of unexplained night fevers, her gastrointestinal problems from the gastric banding, and the adrenal gland cyst. (Tr. at 1358). The doctor listed "shortness of breath, chest pain, cough due to COPD, and pneumonia" during her review of Plaintiff's complaints. (Tr. at 1363). Plaintiff described the symptoms caused by fibromyalgia to the doctor. (Tr. at 1358). She said that she has pain in her shoulders and back, and she is stiff for approximately two hours after she awakens in the morning. She also experiences swelling in her legs and feet. (Tr. at 1358). According to Plaintiff, these symptoms have increased over time. (Tr. at 1358). Dr. Albuquerque saw evidence of tenderness in the joints in all of Plaintiff's extremities, and said that she was in a "significant amount of pain" despite her medication. (Tr. at 1358). Dr. Albuquerque increased the dosage of hydrocodone, and refilled the prescriptions for Lyrica, Savella, and Lidoderm patches. (Tr. at 1359).

Childress was seen by Dennis Roy Ferrer, M.D. ("Dr. Ferrer"), in the endocrinology department at the Kelsey Seybold on February 17, 2010. Dr. Ferrer compared the previous x-rays and acknowledged that the cyst was increasing in size. (Tr. at 1365). He ordered blood tests to rule out Cushing's syndrome, and those tests were negative. (Tr. at 1368). Plaintiff then saw Dr. Scobercea because of back pain that radiated to her abdomen. (Tr. at 1375). She complained of frequent and painful urination for several days, with back and lower abdominal pain. (Tr. at 1381). Dr. Scobercea suspected a urinary tract infection, but the lab results did not support that diagnosis. (Tr. at 1381). He placed her on antibiotics anyway. (Tr. at 1381).

On March 23, 2010, Plaintiff went to the emergency room at Memorial Hermann Northeast Hospital after she "slipped on a piece of plastic wrap at the mall and fell backwards" hitting her head. (Tr. at 526). She complained of pain to her head, neck, and lower back. (Tr. at 526). She was reported to have a bruise on the back of her head, and she complained of tingling

in both hands. (Tr. at 529). She was diagnosed with a mild, closed head injury, and released home with instructions to rest. (Tr. at 551).

Plaintiff went to the emergency room at Memorial Hermann Northeast Hospital on May 3, 2010, because she had a fever, chills, and chest congestion, and believed it was a recurrence of pneumonia. (Tr. at 552). She complained of chest pain, and was only able to take shallow breaths. (Tr. at 560). An x-ray of the chest showed a 9-mm nodule in the left lobe of her lung, so she was admitted to the hospital for a pulmonary consultation. (Tr. at 552). She had signs of gastrointestinal bleeding, and blood tests showed low iron and potassium levels. (Tr. at 555). She received two blood transfusions while in the hospital. (Tr. at 555). After additional tests were completed, she was diagnosed with double pneumonia and treated with intravenous antibiotics. (Tr. at 554). She was released on May 8, 2010, with instructions to follow up in one to two weeks. (Tr. at 554, 555). Plaintiff returned to the emergency room at Memorial Hermann Northeast Hospital on May 27, 2010, complaining of dizziness, chest pressure, and feeling faint. (Tr. at 616). She was diagnosed as suffering from dehydration and low potassium. (Tr. at 630).

On June 16, 2010, Childress was treated at the Kelsey-Seybold Clinic by Dr. Scobercea because she had experienced nausea and a fever for several days. (Tr. at 1383). She told Dr. Scobercea that she had recently been hospitalized for aspiration pneumonia caused by severe reflux. (Tr. at 1383). She also reported that she was finally scheduled to have surgery to revise the gastric band. (Tr. at 1383). Plaintiff did not have a cough, and she was not experiencing shortness of breath. (Tr. at 1389). She was prescribed antibiotics because of her fever, and Zofran for the nausea. (Tr. at 1385). On June 18, 2010, Childress saw Dr. Candace Williams for a pre-operative visit before the gastric band revision surgery. (Tr. at 1014). In addition to the gastric band revision, Plaintiff wanted to have the adrenal mass removed, and bladder suspension surgery to correct "stress incontinence." (Tr. at 1014). The surgery was completed on June 28,

2010, and the adrenal mass was removed during the gastric band repair, but the bladder suspension surgery was not completed. (Tr. at 1020). Dr. Sherman saw Childress one week after the surgery, told her that the adrenal mass was a benign cyst and required no further treatment, and noted that she was recovering well. (Tr. at 1016).

Childress was treated by Dr. Albuquerque, the rheumatologist, on September 13, 2010. (Tr. at 1390). Dr. Albuquerque wrote that Plaintiff had experienced diffuse pain since 1999, and met the criteria for a diagnosis of fibromyalgia. (Tr. at 1391). She also diagnosed osteoarthritis and degenerative disease of the neck and back, hypertension, hypothyroidism, migraine headaches, obesity, COPD, TMJ arthritis, and a hiatal hernia. (Tr. at 1391). Plaintiff told Dr. Albuquerque that she had less nausea after the gastric band revision surgery, her night fevers were better, and the adrenal gland biopsy was normal. (Tr. at 1391). Childress complained, however, that her fibromyalgia symptoms had worsened, and that she now had stiffness for three to four hours each morning, with more severe pain in every joint. (Tr. at 1391). She asked Dr. Albuquerque to change the prescription for Savella to Cymbalta, because she did not think the Savella was effective. (Tr. at 1391). Dr. Albuquerque gave her a thirty day trial of Cymbalta. (Tr. at 1392). Plaintiff was also taking Lyrica, Lortab, amiloride, Norvasc, Fioricet, Prevacid, and Levothyroxine, and using Lidoderm patches for her numerous complaints of pain. (Tr. at 1391). Dr. Albuquerque saw Plaintiff again on January 5, 2011. (Tr. at 1403). Childress told Dr. Albuquerque that the Cymbalta was helping with her depression, but did not seem to reduce the fibromyalgia pain. (Tr. at 1404). Plaintiff had increased her use of pain medication from the last visit, and the pain was worse in her hands, elbows and lower back. (Tr. at 1404). She was in no acute distress or pain when Dr. Albuquerque examined her, and she told the doctor that she was still working at a pet store. (Tr. at 1404). Dr. Albuquerque increased the dosage of

Cymbalta, reduced the dosage of Prozac, and prescribed Robaxin for her low back pain. (Tr. at 1405).

Childress went to the emergency room at Memorial Hermann Northeast Hospital on February 15, 2011. (Tr. at 653). That morning, she began to experience chest pain that radiated to her left side and into her back. (Tr. at 653). She rated the pain to be at a level of "seven," on a scale of "one to ten." (Tr. at 654). An EKG was normal. (Tr. at 666). After six hours at the hospital, Plaintiff left without receiving any treatment. (Tr. at 656-657). Two days later, Plaintiff was treated by Dr. Hyunmo Koo ("Dr. Koo") at the Kelsey-Seybold Clinic. (Tr. at 1414). She complained of chest pain, radiating to her back, and said that she had initially gone to the emergency room, but the wait was too long and she left without treatment. (Tr. at 1414). X-rays of the chest were normal, but Dr. Koo recommended that Plaintiff be seen at an emergency room because of the severity of the pain. (Tr. at 1415). Childress agreed, and she was transported by ambulance to St. Luke's Community Medical Center. (Tr. at 1041, 1415). At the emergency room, she complained of constant chest pain, which she rated to be a "nine out of ten," with shortness of breath and dizziness. She was reported to be "uncomfortable" and in "moderate distress." (Tr. at 1043, 1047). She also complained of numbness in her hands and feet. (Tr. at 1044). An EKG was normal, and x-rays of the chest did not explain her complaints of pain. (Tr. at 1048). Childress was given morphine, and then discharged with instructions to follow up with her doctor. (Tr. at 1045, 1052).

Plaintiff followed up with Dr. Albuquerque because of an acute flare up of her fibromyalgia symptoms on February 22, 2011. (Tr. at 1423). Dr. Albuquerque noted that Childress was already taking the maximum dosage of the fibromyalgia medications, as well as high doses of pain medications. (Tr. at 1425). Because of that, Dr. Albuquerque gave Plaintiff an injection of Depo-Medrol, an anti-inflammatory steroid, with instructions to see a pain

management doctor if the treatment did not work and her symptoms did not subside. (Tr. at 1425). The use of Robaxin was increased to twice a day, and she was told to follow up with a doctor for her back pain.

On March 9, 2011, Plaintiff saw Dr. Marianna Karpinos ("Dr. Karpinos"), in the neurology department of the Kelsey-Seybold Clinic. (Tr. at 1433). She told Dr. Karpinos that she had persistent headaches which increased in intensity until she was required to sit in a quiet, dark place for several hours. (Tr. at 1434). Although she was already taking Fioricet and Excedrin for the headaches, and Xanax for anxiety, she still had twelve to thirteen headaches a month and said they had worsened when she stopped drinking caffeine. (Tr. at 1434). She told Dr. Karpinos that she also had tremors in both hands. (Tr. at 1434). An MRI of the brain and head was negative, with the exception of a mild sinus infection. (Tr. at 1434). Dr. Karpinos's neurological examination of Childress was normal, except for occasional jerking in both hands. (Tr. at 1436). Dr. Karpinos continued the prescription of Fioricet, and also gave Plaintiff trial samples of diclofenac, Inderal, and clonazepam to see if any of those medications were more effective for the headaches. (Tr. at 1436).

Plaintiff returned to her family doctor, Dr. Scobercea, on May 13, 2011. (Tr. at 1444). She complained that her migraines were still not controlled, but that she was awaiting a prescription of Inderal to be filled. (Tr. at 1445). She told Dr. Scobercea that the pain from her fibromyalgia was increasing, as was her anxiety. (Tr. at 1445). He gave her prescriptions for propranolol for her hypertension, Cymbalta for fibromyalgia, Xanax for anxiety, and Fioricet for the migraine headaches. (Tr. at 1453). Childress returned to Dr. Scobercea on May 25, 2011, to be treated for an upper respiratory infection. (Tr. at 1453). She complained of a cough, congestion, and mild shortness of breath. (Tr. at 1454). She also told Dr. Scobercea that her Combivent inhaler was empty, and she needed a new one. (Tr. at 1454). The doctor diagnosed

her to be suffering from an exacerbation of her COPD, and prescribed prednisone and the Combivent inhaler. (Tr. at 1455).

Dr. Albuquerque saw Childress on July 18, 2011, in the rheumatology department. (Tr. at 1462). Plaintiff complained of increased pain in her right knee, insomnia, and anxiety. (Tr. at 1462). She told Dr. Albuquerque that the fibromyalgia symptoms were about the same, and she still had pain in all of her joints. (Tr. at 1462). The doctor gave her an injection of lidocaine and depo-medrol in the right knee, and recommended that she try Lunesta to help her sleep. (Tr. at 1464). On September 21, 1011, Dr. Scobercea treated her for shortness of breath that had lasted for more than a week. (Tr. at 1473). He again prescribed prednisone, and told her to increase the Combivent use from twice a day to four times a day. (Tr. at 1475).

Childress followed up with the rheumatologist, Dr. Albuquerque, on November 2, 2011. (Tr. at 1482). Plaintiff complained that her pain was worse, her hands and ankles were swelling, and her right knee hurt and "gave out" when walking. (Tr. 1482). She told the doctor that she was seeing a therapist because of her increased stress levels, and her insomnia was worsening and was not controlled by medication. (Tr. at 1482). Dr. Albuquerque described her as "comfortable and in no acute distress or pain," and reported that her shortness of breath was better, although she still complained of nausea and diarrhea. (Tr. at 1492). The doctor refilled her prescriptions and told her to return in four months. (Tr. at 1493). Plaintiff next saw Dr. Francis Williams ("Dr. Williams") in the rheumatology department at Kelsey-Seybold Clinic on January 6, 2012, to be treated for right knee and left hip pain. (Tr. at 1495). She told Dr. Williams that her knee "gave out" the day before, but it had also hurt intermittently for several weeks. (Tr. at 1495). She also said that her left hip had been sore over the same time period. (Tr. at 1495). Childress complained to him that her pain from the fibromyalgia was not controlled by the medications. (Tr. at 1495). X-rays showed osteoarthritis in the right knee and

bursitis in the left hip, which Dr. Williams believed was caused by Plaintiff "favoring" her right knee. (Tr. at 1497). Dr. Williams injected Kenalog in Plaintiff's knee and hip, and told her to follow up with Dr. Albuquerque for treatment of her fibromyalgia. (Tr. at 1497).

On February 29, 2012, Plaintiff told Dr. Albuquerque that the fibromyalgia pain was worse, and that she had gained weight while on Lyrica even though she was not eating very much. (Tr. at 1505). She had an upper respiratory infection, with a fever and sore throat, but her lungs were clear and her shortness of breath was better. (Tr. at 1506-1507). Dr. Albuquerque prescribed gabapentin, and told her to reduce the dosage of Lyrica. (Tr. at 1507). Even though the medications were not effective in controlling her pain, Plaintiff told Dr. Albuquerque that she did not want them changed because she was under a lot of stress at home and believed the medications helped with her anxiety. (Tr. at 1507).

Dr. Scobercea saw Plaintiff the following day to treat the upper respiratory infection. (Tr. at 1515). She told Dr. Scobercea that she had experienced headaches for over a week, with sinus pain, and low grade fevers. (1515). The doctor described her as "nervous" and "anxious," and diagnosed a sinus infection which was treated with antibiotics. (Tr. at 1516). One week later, on March 8, 2012, Childress returned to Dr. Scobercea because she was vomiting, fatigued, and felt dizzy. (Tr. at 1524). She had stopped taking her medication three days earlier after having a tooth extracted, because the combination of medicines caused her to vomit. (Tr. at 1525). Even though her speech and behavior were normal, she exhibited a depressed mood. (Tr. at 1526). Dr. Scobercea believed her symptoms showed that she was suffering withdrawal from Cymbalta, and he told her to resume that medication. (Tr. at 1526).

On September 19, 2012, Childress switched medical providers because the Kelsey-Seybold Clinic no longer accepted her health insurance. She began seeing Dr. Antwar Harrell, ("Dr. Harrell") at the Family Medical Center at Klein. (Tr. at 955). Dr. Harrell took a lengthy

medical history of each of Plaintiff's complaints. She told him that she had anxiety that was "not totally controlled," and it caused insomnia. (Tr. at 955). She did not like crowds, and her anxiety caused her to be unable to handle stressful situations, which prevented her from maintaining steady employment. (Tr. at 955). She explained that she suffered from shortness of breath, and occasionally wheezes. (Tr. at 955). She uses a nebulizer machine at home, and a Combivent inhaler, to treat her difficulty in breathing. (Tr. at 955). Childress told Dr. Harrell that she did not use Lyrica for her fibromyalgia because it caused weight gain, but had received trigger point injections from her rheumatologist for back pain. (Tr. at 955). She also explained that her blood pressure increased when she was in a stressful situation. (Tr. at 955). Dr. Harrell reviewed her list of medications, completed blood tests, and renewed her prescriptions. (Tr. at 956-957).

The same day, Dr. Harrell completed a Medical Opinion Questionnaire on Plaintiff's Physical Activities. (Tr. at 890-892). He noted that this was her first visit to him, and that he had met with her for one hour. (Tr. at 890). He said that she suffered from fibromyalgia, anxiety disorder, "suspected ptsd [post traumatic stress disorder]" and that she had a "poor to fair" prognosis. (Tr. at 890). According to Dr. Harrell, Plaintiff could not walk even a full block before requiring rest; she could stand for only fifteen minutes at a time; and could sit for more than two hours. (Tr. at 890). She could stand and walk for less than two hours in a work day, and needed the ability to shift from sitting to standing at will, but she did not require a cane or walker. (Tr. at 890-891). She also must take four, unscheduled breaks each day for ten to fifteen minutes each. (Tr. at 890). She could lift objects weighing up to ten pounds only occasionally, and could never lift objects weighing more than that. (Tr. at 891). He placed significant limitations on her ability to use her hands, and said that she could not use her hands or fingers to grasp or manipulate at all, but could reach up to five percent of the time. She could bend and

twist only five percent of the time. (Tr. at 891). She must avoid all exposures to hot, cold, chemicals and fumes, and was expected to be absent from work more than twice a month. (Tr. at 892).

Dr. Harrell also completed a questionnaire regarding her mental impairments. (Tr. at 893-895). He believed her prognosis was "poor to fair," and he listed a number of limitations on her mental abilities and aptitude. (Tr. at 893). He rated as "poor or none" her ability to interact appropriately with the general public; travel in unfamiliar places; use public transportation; complete a normal workday and workweek without interruptions from psychologically based symptoms; accept instructions and respond appropriately to criticism from supervisors; deal with normal workday stress; and, deal with stress of semiskilled and unskilled work. (Tr. at 893-894). He rated as "fair" her ability to "respond appropriately to changes in a routine work setting," "maintain attention for a two hour segment," and "perform at a consistent pace." Dr. Harrell believed that her ability to understand and carry out instructions was "good." (Tr. at 894).

Dr. Harrell saw Plaintiff on October 22, 2012. (Tr. at 952). On that day, Plaintiff complained of being fatigued after standing for a prolonged time the day before. (Tr. at 952-953). Dr. Harrell refilled all of her prescriptions and completed a Mental Status Report on Plaintiff on December 12, 2012. (Tr. at 944-946, 952). He described her as having a normal mood and affect, with good insight and judgment, but said that she showed a mildly pressured thought process. (Tr. at 944-945). He diagnosed her as suffering from an anxiety disorder, and believed her prognosis was poor, because it had not improved over time and would probably "take years . . . to achieve improvement." (Tr. at 946). Dr. Harrell also wrote that Childress told him that she had significant problems in the past with work stress. (Tr. at 946). On December 14, 2012, Plaintiff told Dr. Harrell that she felt like she might have the flu, because she had a sore throat, runny nose, night sweats, and muscle aches. (Tr. at 953). She also told him that she

was occasionally short of breath, especially when climbing stairs. (Tr. at 953). Although her blood pressure was under control, she said that her anxiety was not. (Tr. at 953).

Plaintiff was examined by Dr. George Isaac, an internal medicine doctor, acting on behalf of the state, on December 19, 2013. (Tr. at 967). Plaintiff told him that she had suffered from shortness of breath for ten years, fibromyalgia for four years, migraine headaches for thirteen years, hypertension for thirty years, and depression for sixteen years. (Tr. at 967). She said that she suffered from pain in all of her joints, especially when it was rainy, but was able to dress and brush her hair and teeth by herself, although she occasionally required assistance from her husband. (Tr. at 967). Dr. Isaac said that her "general appearance" was consistent with "moderate depression" and "chronic pain." (Tr. at 969). She was able to walk without any help, but at a slow speed. (Tr. at 969). She did need some assistance to get on the examination table, and to get up after lying down. (Tr. at 969). Dr. Isaac saw evidence of "moderate pain and tenderness in all joints of fingers and elbows and shoulders and knees." (Tr. at 970). The range of motion in her lumbar spine was limited because of pain. (Tr. at 970). Flexion was limited to thirty degrees, extension to zero degrees, and lateral flexion to three degrees. (Tr. at 970). When she tried to bend over and touch the floor, her fingers stopped just below her knees, eighteen inches from the floor. (Tr. at 970). She had a reduced range of motion in her shoulders, but had normal strength in her hands, was able to pick up small objects, and to button her clothes. (Tr. at 970). She was unable to hop, and could not complete the tandem walk because she lost her balance. (Tr. at 970). She needed assistance to walk on her toes and heels for a few steps, and could squat and get up if she was given support. (Tr. at 970). Dr. Isaac concluded that "she is able to sit and stand and ambulate office area . . . without assistive device." (Tr. at 971). He also determined that she could "lift and carry objects of five pounds to forty feet," and her ability to reach, feel, and grasp were normal. (Tr. at 971).

On January 21, 2013, Childress was examined by Evelyn Turner, Ph.D. ("Dr. Turner"), a licensed psychologist, and Kassandra Humpress, a licensed professional counselor, who were acting on behalf of the state. (Tr. at 974-978). Dr. Turner believed Plaintiff to be a reliable historian, and said that she co-operated in the examination. (Tr. at 974). Plaintiff told Dr. Turner that she was unable to work because of poor focus and anxiety. (Tr. at 975). She was crying on arrival at the office, and told Dr. Turner that she cried daily, and was easily upset. (Tr. at 975). Childress also told Dr. Turner that she was not able to bathe or dress herself without help, drive a car, shop for groceries, or manage her finances. (Tr. at 976). She told Dr. Turner that she felt sad and irritable, and saw a counselor every other month. Dr. Turner reported that complaint as consistent with her overall affect. (Tr. at 977). Plaintiff also said that she could not remember to take her medication without reminders from her husband. (Tr. at 977). Her performance on the Mental Status Examination was normal in nearly every category, except that she did have trouble remembering things. (Tr. at 977). Dr. Turner diagnosed her with generalized anxiety disorder, major depressive disorder, and personality disorder. She assigned her a GAF score of 64. (Tr. at 978). She explained that Plaintiff was experiencing "mildly disturbing psychiatric symptoms," with "poor reasoning, sadness, fatigue, chronic pain, and labile moods." (Tr. at 978). She believed Plaintiff's prognosis was fair, and that counseling would help her control the anxiety and depression. (Tr. at 978).

Andrea Fritz, M.D. ("Dr. Fritz"), a family doctor acting on behalf of the state, reviewed Dr. Isaac's report and prepared a Physical Residual Functional Capacity Assessment. (Tr. at 152-157). Dr. Fritz determined that Plaintiff suffered from fibromyalgia, COPD, and back pain, but said that all of the physical examinations were normal. (Tr. at 153). According to Dr. Fritz, Plaintiff could lift objects weighing up to fifty pounds occasionally, and objects weighing up to twenty five pounds frequently. (Tr. at 155). Childress could stand and walk for up to six hours

in a work day, and sit for the same length of time, according to Dr. Fritz. (Tr. at 155). Dr. Fritz placed no manipulative limitations or environmental limitations on her. (Tr. at 153). Childress could kneel, crawl, balance and push or pull on an unlimited basis, but could only crouch (bend at the knee) occasionally. (Tr. at 153, 155). She could bend at the waist and climb stairs, ladders and ropes only occasionally. (Tr. at 155). Richard Campa, Ph.D., ("Dr. Campa"), a psychologist acting on behalf of the state, reviewed Dr. Turner's report and gave his opinion on Plaintiff's mental residual functional capacity. (Tr. at 153-157). He said that Childress was moderately limited in her abilities to respond appropriately to changes in the work setting, accept instructions and respond appropriately to criticism from supervisors, get along with coworkers or peers, and carry out detailed instructions. (Tr. at 153-154). Dr. Campa explained that Plaintiff responded poorly to stress, but, she was able to interact with others and concentrate for extended periods of time. (Tr. at 156).

On April 26, 2013, Plaintiff's lung function was tested by Dr. Sandeeb Gupta, a pulmonologist acting on behalf of the state. (Tr. at 995). Dr. Gupta commented that Childress did give a good effort on the tests, but he did not interpret the results. (Tr. at 995). Kim Rowlands, M.D., ("Dr. Rowlands") an internal medicine doctor acting on behalf of the state, then completed a second Physical Residual Functional Capacity Assessment for Plaintiff. (Tr. at 170-173). Dr. Rowlands pointed out that the results of the pulmonary function test were "above listing level." She also reviewed Dr. Isaac's report, and concluded that Plaintiff could occasionally lift objects weighing up to twenty pounds, and frequently lift objects weighing up to ten pounds. (Tr. at 171). Plaintiff could stand or walk for up to six hours in a work day. (Tr. at 171). She could frequently kneel, crouch, and climb stairs, but could only occasionally climb ladders or scaffolds, balance, or bend at the waist. (Tr. at 171). Childress did not have any limitations on the use of her hands to manipulate objects. (Tr. at 172). Matthew Snapp, Ph.D.,

("Dr. Snapp"), a psychologist acting on behalf of the state, reviewed the report from Dr. Turner and completed a mental residual functional capacity assessment. (Tr. at 173). He determined that Plaintiff was "markedly limited" in her ability to understand and remember detailed instructions, and to carry out detailed instructions. (Tr. at 173). She was moderately limited in her abilities to work with others, complete a workday without psychological interruptions, and accept instruction and respond appropriately to criticism from supervisors. (Tr. at 174). He concluded that Plaintiff could understand and carry out simple instructions, make simple decisions, concentrate for extended periods of time, and respond appropriately to changes in the workplace. (Tr. at 175).

Plaintiff saw Dr. Harrell again on May 29, 2013. (Tr. at 1563). She complained at that time that her knee was "giving out," and that she was suffering from significant back pain. (Tr. at 1564). Dr. Harrell gave her an injection of depo-medrol in her right knee. (Tr. at 1565). He then recommended breast reduction surgery to relieve her back pain. (Tr. at 1565). Childress returned on August 2, 2013. (Tr. at 1559). She told Dr. Harrell that her condition had become worse since the last visit. (Tr. at 1561). She continued to have back pain and increasing muscle aches, and now had stomach pain, as well. (Tr. at 1561). The pain medication was not effective. (Tr. at 1561). Dr. Harrell continued her medications without any changes, however. (Tr. at 1562). She went back to Dr. Harrell four days later because her stomach pain was worse. (Tr. at 1553). He adjusted her thyroid medication. (Tr. at 1553). Plaintiff saw Dr. Harrell at least once a month between November, 2013, and February, 2014, for various ailments including influenza, sinus infections, and vitamin D deficiency. (Tr. at 1654-1661). She complained during those visits that she still had recurring headaches, muscle pain, and back and joint pain. (Tr. at 1639, 1644, 1646).

On January 28, 2014, Dr. Harrell completed questionnaires describing Plaintiff's impairments from headaches and her gastrointestinal distress. (Tr. at 1624-1631). He explained that Plaintiff's headaches caused nausea, affected her ability to concentrate, and impeded her ability to sleep. (Tr. at 1624). Harrell treated her headaches with medication, and advised her to lie down in a dark, quiet room. (Tr. at 1624). The headaches were triggered by stress and a lack of sleep, and were made worse by bright lights and noise. (Tr. at 1624). Dr. Harrell said that Plaintiff's anxiety contributed to her symptoms, and that these symptoms "occasionally" interfered with her attention and concentration. (Tr. at 1625-1626). Her gastrointestinal distress from the gastric band surgeries and irritable bowel syndrome caused periodic cramping, pain and diarrhea. (Tr. at 1628). Those symptoms were usually caused by stress, and made worse by her anxiety. (Tr. at 1629). Dr. Harrell wrote on both forms that Plaintiff could walk only one block, that she could sit for one hour and stand or walk for thirty minutes, and was limited to standing or walking for no more than two hours in a typical workday. (Tr. at 1630, 1626). She would need at least two breaks a day, and must lie down at least once for thirty minutes. (Tr. at 1626, 1630). Plaintiff would miss more than two days of work each month. (Tr. at 1627, 1631).

Childress returned to Dr. Harrell's office on May 27, 2014, and was seen by Raul Lopez Valle, M.D. ("Dr. Valle"). (Tr. at 1634). She told Dr. Valle that she had experienced flu like symptoms and a headache more than a week, and that her right knee hurt. (Tr. at 1634). She asked him to prescribe Tamiflu, and administer a cortisone injection in the knee. (Tr. at 1634). A flu test was negative, so he prescribed Nasacort and told her to continue to use the Combivent inhaler to reduce her wheezing and shortness of breath. (Tr. at 1639).

Dr. Harrell prepared a "Medical Opinion RE: Ability to Do Physical Activities" on July 11, 2014. (Tr. at 1716-1748). He stated that he was Plaintiff's primary care physician, and had treated her every three months for almost two years. (Tr. at 1716). He diagnosed her to be

suffering from hypothyroidism, vitamin D deficiency, hypertension, COPD, fibromyalgia, chronic back pain, and anxiety disorder. (Tr. at 1716). According to Dr. Harrell, Plaintiff could walk only one block at a time before requiring rest, could stand for ten minutes at a time, and could sit for thirty minutes at a time. (Tr. at 1716). He said that she could only sit for two hours in total, and could stand or walk for the same amount of time, in a full workday. (Tr. at 1716). She needed to be able to shift from sitting to standing at will, and might require two unscheduled breaks an hour. (Tr. at 1716). She needed to elevate her legs at least one half of the time that she was seated, and could lift objects weighing up to ten pounds only occasionally. (Tr. at 1717). She could grasp and turn objects, manipulate objects with her fingers, and reach for objects for only ten percent of the time that she worked. (Tr. at 1717). She could bend at the waist ten percent of the time, and twist at the waist only fifteen percent of the time. (Tr. at 1717). He believed that she would miss more than two days from work each month. (Tr. at 1718).

Dr. Harrell also prepared a "Medical Opinion Questionnaire (Mental Impairments)" describing the effect her impairments have on her mental and emotional capabilities. (Tr. at 1719-1721). He said that she had a "poor" ability to accept instructions and respond appropriately to criticism from supervisors, to perform at a consistent pace without an unreasonable number of breaks, and to complete a normal workday and workweek without interruption from psychologically based symptoms. (Tr. at 1720). She had a "fair" ability to respond to changes in the workplace, deal with stress in the workplace, and maintain attention for two hours. (Tr. at 1720). He explained that her ability to handle work place stress was dependent upon the personalities of her coworkers, the particular work environment, and the amount of criticism from her supervisor. (Tr. at 1721). He said that her prognosis was "fair", but he expected her to miss work more than twice a month. (Tr. at 1719, 1721). He completed a

"Fibromyalgia Questionnaire" and listed the same limitations on her activities. (Tr. at 1722-1727). He said that she had bilateral, aching pain throughout her body, with intermittent burning and sharp pain. (Tr. at 1723). She could sit for thirty minutes at a time, or a maximum of two hours in a workday, and could stand for ten minutes at a time, with a maximum of two hours in a workday. (Tr. at 1724-1725). She could "likely" walk one block before she needed to rest, and would require at least two breaks each hour while at work. (Tr. at 1724-1725). She could not lift more than ten pounds, and could use her arms, hands and fingers only ten percent of the time. (Tr. at 1726). She would be absent from work at least two times a month. (Tr. at 1727).

### Educational History, Background, and Present Age

At the time of the hearing, Childress was 52 years old. (Tr. at 110). She has a seventh grade education. (Tr. at 93,121). She worked as a waitress and bartender from 2000 to 2004. (Tr. at 93, 121). She also worked as a cashier and pet groomer in 2009 and 2010, but did not earn enough at those jobs for it to be considered "substantial gainful activity." (Tr. at 93, 122, 175).

### Subjective Complaints

In her application for disability benefits, Plaintiff said that she suffers from back pain, fibromyalgia, migraines, high blood pressure, stomach and voiding problems, joint pain, hypothyroidism, COPD, depression and anxiety. (Tr. at 362). She stated that she frequently drops objects because she "can't seem to hold on to them," and is not able to stand for long periods of time because of her fibromyalgia and back pain. (Tr. at 374). She claimed that she does not handle stress well, and becomes anxious around other people. (Tr. at 374). She explained that her husband helps her bathe, washes her hair, cooks for her, and helps her dress. (Tr. at 375). She said that she is able to make a sandwich for lunch, but no longer cooks because she is not able to remember recipes and cannot stand in front of the stove for long periods of

time. (Tr. at 376). She tries to do housework, but her husband will not let her because she becomes short of breath. (Tr. at 376-378). Her husband accompanies her when she shops for groceries, because she becomes anxious and is not able to do it alone. (Tr. at 378). She said that she can lift objects weighing up to five pounds only, and is able to walk two flights of stairs with her husband's help. (Tr. at 380). She can walk for about ten minutes at a time, and then must rest for ten minutes. (Tr. at 380). She stopped working as a pet groomer, because she was not able to cope with the stress from her supervisor yelling at her. (Tr. at 388). On February 21, 2013, Childress reported that these symptoms, especially the anxiety and shortness of breath, had become worse since she originally filed her application for benefits in August, 2012. (Tr. at 412).

Plaintiff testified before the ALJ on February 5, 2014. (Tr. at 89-106). Because her back pain had become worse, she came to the hearing using a cane and said that she uses it at all times, even at home. (Tr. at 92). She said that she suffers from migraine headaches, pain in her lower back which radiates into her legs, and gastrointestinal problems that cause diarrhea almost daily. (Tr. at 94). She explained that she has headaches almost every day, and that medication does not help, so she lies down in a dark room with ice compresses. (Tr. at 95). The most severe headaches occur twice a week. (Tr. at 99). She can walk or stand for approximately twenty to twenty-five minutes before she must sit down. (Tr. at 97-98). She is afraid that she will fall, so she uses a cane to walk about her house. (Tr. at 98). She has COPD that causes her to be short of breath, and her symptoms are triggered by walking, stress, and temperature extremes. (Tr. at 100). She uses a Combivent inhaler every day, and a nebulizer two to three times a day, because of her breathing problems. (Tr. at 99). The fibromyalgia causes pain in her joints and fingers. (Tr. at 101). She testified that it was hard for her to walk because her knees hurt. (Tr. at 101). She has accidently overdosed on her medication twice, so her husband prepares the medicine for

her. (Tr. at 102). She confirmed that her husband does almost all of the household chores, and he helps her to bathe and to dress. (Tr. at 104).

ALJ Gutierrez held a second hearing on July 22, 2014. (Tr. at 118). At this hearing, Plaintiff testified that she rarely goes outside, because heat aggravates her COPD. (Tr. at 125). She repeated that her husband helps her to bathe, to dress, and to tie her shoes. (Tr. at 127). She claimed that she still has nausea, vomiting and diarrhea every day. (Tr. at 128). She also said that she has chronic fatigue, in addition to fibromyalgia. (Tr. at 129). Her joint pain and headaches were only mildly relieved by the pain medications, and her pain level, even with the medicine, was usually a "six out of ten." (Tr. at 130). She further explained that she uses a cane, even though it was not prescribed by a doctor, because her knees "give out." (Tr. at 131-132).

### *Expert Witness Testimony*

At the February 5, 2014, hearing, the ALJ also heard testimony from Durado D. Brooks, M.D. ("Dr. Brooks"), an internal medicine doctor. (Tr. at 105-112). Dr. Brooks explained that Plaintiff has fibromyalgia, and he said that diagnosis was confirmed by her rheumatologist. (Tr. at 106). Plaintiff also has chronic headaches, that might be migraines, and degenerative joint disease in the cervical and lumbar spine. (Tr. at 107). She has chronic shortness of breath, but the cause of that condition is not known, and the pulmonary studies that were done were essentially normal. (Tr. at 107). Dr. Brooks testified that these conditions did not meet or equal the medical criteria for any disabling impairment in the applicable SSA regulations.[7]

Dr. Brooks then described the limitations on Childress's ability to function in the work setting because of her health impairments. (Tr. at 108). He recommended that she be limited to occasionally lifting and carrying objects weighing no more than ten pounds, but she could

---

[7] A claimant is presumed to be "disabled" if his impairments meet, or equal in severity, a condition that is listed in the appendix to the Social Security regulations. *Falco v. Shalala*, 27 F.3d 160, 162 (5th Cir. 1994).

frequently lift and carry objects weighing less than that. (Tr. at 108). He believed that she should be limited to standing and walking for only two hours in an eight hour workday. (Tr. at 108). She could sit for up to six hours, but must be able to alternate between sitting and standing. (Tr. at 108). She could push or pull objects weighing up to ten pounds on an occasional basis, and could only occasionally use her hands and fingers to grasp and manipulate objects. (Tr. at 109). She should never climb ladders, ropes or scaffolds, and must avoid all environmental hazards. (Tr. at 109).

Susan Rapant ("Ms. Rapant"), a vocational expert witness, then testified. (Tr. at 112-116). She agreed that Childress would not be able to do her past relevant work. (Tr. at 114). She testified that, with the residual functional capacity described by Dr. Brooks, Plaintiff could work as a surveillance system monitor because that is a sedentary, unskilled position that only requires an occasional use of her hands. (Tr. at 114). There were approximately 900 positions in the local economy, and 140,000 of those positions available in the national economy. (Tr. at 114). Plaintiff's attorney then questioned Ms. Rapant, who confirmed that this was the only job that Childress could do, in light of the limitations that Dr. Brooks had placed on her. (Tr. at 115). Ms. Rapant also said that if Plaintiff had only a poor ability to complete a normal workday or workweek without interruptions from psychologically based symptoms, or a poor ability to handle workplace stress, she could not maintain even that job. (Tr. at 115). Ms. Rapant also testified that if Plaintiff was absent more than twice a month, or needed to take four ten minute breaks a day, or was able to sit for only four hours in a day, she would not be employable. (Tr. at 115-116).

It was further noted during that first hearing that Childress had turned fifty years old on July 5, 2012, eighteen months after the alleged onset date of her disability, and before the

expiration of her eligibility for benefits. (Tr. at 109). Upon turning fifty, application of the Act's "grid" might dictate a finding of disabled if she did not have transferable skills. (Tr. at 109).

For some reason, a second hearing took place on July 22, 2014. At that subsequent hearing, the ALJ heard testimony from a different medical expert witness, Phillip Bentlif, M.D. ("Dr. Bentlif"), an internal medicine doctor and a specialist in gastroenterology. (Tr. at 131-138). Dr. Bentlif stated that Plaintiff suffered from recurring sinus infections, bariatric surgery with nausea and vomiting, COPD with attacks of pneumonia, fibromyalgia with pain, and osteoarthritis of the knee. (Tr. at 134). He believed that Plaintiff was capable of doing "light work," and could lift and carry objects weighing up to twenty pounds occasionally, and objects weighing up to ten pounds frequently. (Tr. at 135). She could stand or walk for six hours, occasionally climb one flight of stairs, and occasionally climb ladders, ropes and scaffolds. (Tr. at 135). Dr. Bentlif said that Plaintiff could also occasionally balance, stoop, kneel, crouch, and crawl. (Tr. at 136). She could frequently use her hands and fingers to reach, handle, grasp, and feel. (Tr. at 137). Dr. Bentlif agreed with the ALJ that Plaintiff should have the option to use a cane. (Tr. at 139). He also said that he considered her complaints of pain, fatigue, and the effects of her medication in determining her residual functional capacity. (Tr. at 139).

Kay Squires Gilreath ("Ms. Gilreath"), a vocational expert witness, also testified. (Tr. at 139-143). She described Plaintiff's past work as a waitress and bartender to be "light, semi-skilled" work. (Tr. at 139). The ALJ asked her to consider a hypothetical person, who had the residual functional capacity described by Dr. Bentlif:

> Q    And let me put the following non-exertional limitation. That the claimant can understand, remember, and carry out simple instructions. So let's limit her to simple or unskilled work with little or no vocational training. And a work environment free of any fast paced production requirements. Involving only simple work-related decisions. That means having only occasional decision making requirements. And only occasional changes in the work setting. With no tandem or team work. And only occasional

interaction with co-workers and the public. And that means brief, infrequent, superficial contact. And the claimant is able to respond to the usual work situations and to changes in the routine work setting. Maintain concentration and attention for two hour segments over an eight hour period. And complete a normal work week without excessive interruptions from psychologically or physically based symptoms. Tell me what jobs she could perform.

A    Well, it would rule out past work. Would look at jobs such as in-office mail clerks. These will all be light, unskilled at 209.687-026. Over 3,000. Over 200,000. There are office helpers, 222.687-022. Again over 3,000. Over 200,000. There are photocopy machine operators, 207.685-014. Over 3,500. Over 200,000.

Q    And if we limited her stand and walk to four hours as opposed to six, tell me what job at the light level she could perform.

A    Those jobs that I listed would still fall within that hypothetical.

(Tr. at 140-141). Plaintiff's attorney asked Ms. Gilreath about a hypothetical worker with the

limitations described by Dr. Harrell:

Q    I would like to give vocational expert a hypothetical based on the claimant's treating physician's medical source statement. And that limits the claimant to sitting two hours of an eight hour day for 30 minutes at a time. Standing and walking two hours of an eight hour day, ten minutes at a time. The claimant would need unscheduled breaks during an eight hour day, twice per hour. The claimant's feet would need to be elevated fifty percent of the time that she would be sitting. The claimant can lift ten pounds occasionally and ten pounds frequently. The claimant's ability to grasp, reach, and fine –perform fine manipulation would be – should be limited to ten percent of the workday. The percentage of the time that claimant should bend or twist – bend would be ten percent of the workday. Twist would be fifteen percent of the workday, eight hour workday. . . . the claimant should never be required to stoop or crouch. And the claimant should only occasionally climb ladders and occasionally climb stairs. And the claimant would be expected to be absent from work more than twice per month. Is that a residual functional capacity for competitive work.

A    That's not. It reduces someone to below an eight hour workday.

(Tr. at 141-142).

### The ALJ's Decision

Following the hearings, the ALJ made written findings on the evidence. (Tr. at 56-77). From his review of the record, he determined that Childress was suffering from degenerative disc disease, osteoarthritis of the right knee, fibromyalgia, chronic obstructive pulmonary disease, migraines, hypothyroidism, irritable bowel syndrome, depression, anxiety and personality disorder. (Tr. at 58). He found that those impairments were "severe." (Tr. at 58). He determined, however, that Childress's complaints did not meet or medically equal the severity of any listed impairments. (Tr. at 58-61). He explained that the osteoarthritis of the knee was not accompanied by a "gross anatomic deformity, bony destruction, or ankyloses of the affected joint," and that she was able to ambulate without assistance, even though she did use a cane. (Tr. at 58-59). According to the ALJ, the medical evidence did not show a compromised nerve root combined with the degenerative disc disease, satisfying the listing criteria for back pain. (Tr. at 59). Plaintiff's pulmonary function test showed sufficient lung function so that her COPD did not meet the criteria to be considered disabling. (Tr. at 59). The hypothyroidism, irritable bowel syndrome, and fibromyalgia similarly did not manifest the required symptoms to satisfy a listing criteria.[8] (Tr. at 59). The ALJ then considered whether Plaintiff's mental depression or anxiety met the criteria to be considered disabled. (Tr. at 60). The ALJ pointed out that Plaintiff had moderate restrictions in her activities of daily living, needed help to shower, to wash her hair, and to tie her shoes. (Tr. at 60). He said that she had marked difficulties in social functioning, and does not drive or go out alone. (Tr. at 60). Although she has difficulty in interacting with neighbors, he pointed out that none of her treating doctors had any difficulty interacting with her. (Tr. at 60). She also had moderate difficulties with concentration, persistence, and pace, and

---

[8] The ALJ noted that fibromyalgia does not have a separate listing and so he considered it under the musculoskeletal listing. (Tr. at 59).

needed reminders to take her medicine. (Tr. at 60-61). However, Childress had experienced no

episodes of decompensation because of her depression or anxiety, she did not require a highly

supervised or structured environment, and she was able to live independently. (Tr. at 61).

Because of that, the ALJ determined that she did not meet the criteria to be found disabled from

her depression or anxiety. (Tr. at 21-22).

The ALJ then determined that Childress still had:

> "the residual functional capacity to perform light work ... except she must have
> the ability to ambulate with a cane; she is able to frequently as opposed to
> constantly reach in all directions, handle, finger and feel bilaterally because of
> fibromyalgia; occasionally climb ramps, stairs, ladders, ropes or scaffolds,
> balance, stoop, kneel, crouch and crawl; she must avoid exposure to extreme cold,
> fumes, dust, irritants, gases and poorly ventilated areas; she must avoid more than
> occasional exposure to moving machinery, unprotected heights and open flames;
> she must avoid loud noise and vibrations because of migraines; she is able to
> perform simple, unskilled work with little or no vocational training; she must
> work in an environment free of fast pace production requirements requiring only
> occasional decision making requirements and changes in the work setting with no
> tandem or teamwork because the treating physician stated that her irritable bowel
> syndrome could handle low stress work; she must avoid more than occasional
> interaction with co-workers and the public, meaning brief, infrequent and
> superficial and she is able to respond to changes in a routine work setting and
> maintain attention for two hour periods."[9] (Tr. at 61-62).

The ALJ concluded, ultimately, that Childress was not disabled as defined by the Act, because

there were jobs in the local and national economies that she could do, and so he denied her

application for disability insurance benefits. (Tr. at 71). That denial prompted this request for

judicial review.

It is well settled that judicial review of the Commissioner's decision is limited to a

determination of whether it is supported by substantial evidence, and whether the ALJ applied

---

[9] "Light work" involves lifting no more than twenty pounds, occasionally, with the ability to lift or carry items
weighing up to ten pounds frequently. Although the weight lifted may be very little, a job is designated as "light" if
it requires a good deal of walking or standing, or if it involves sitting a majority of the time, with some pushing and
pulling of arm or leg controls. To be considered capable of performing a full range of light work, an individual must
be able to perform substantially all of the activities listed. An individual must also be capable of performing
sedentary work, unless there are additional limiting factors, such as the loss of manual dexterity, or the inability to
sit for long periods. 20 C.F.R. §§404.1567(a),(b).

the proper legal standards in making it. *See Myers*, 238 F.3d at 619; *Newton*, 209 F.3d at 452 (citing *Brown*, 192 F.3d at 496). Any conflict in the evidence is to be resolved by the ALJ, and not the court. *See id.* A finding of "no substantial evidence" is proper only if there are no credible medical findings or evidentiary choices that support the ALJ's decision. *See Johnson*, 864 F.2d at 343-44 (quoting *Hames*, 707 F.2d at 164).

### *The ALJ Failed to Consider All of the Medical Opinions*

Childress contends that the ALJ erred because he ignored Dr. Brooks' testimony which placed her at a sedentary level of work. (Plaintiff's Motion at 5)("The ALJ never acknowledged or discussed Dr. [Brooks'] testimony."). An ALJ is required to evaluate every medical opinion he receives and explain the weight given to that medical opinion after considering a list of factors. *See* 20 C.F.R. §§ 404.1527(b), (c), 416.927 (b), (c). The ALJ can disregard the testimony of a medical expert if it is inconsistent with the rest of the medical evidence, but he must consider it, and explain the weight given to it. *Ventura v. Colvin*, 2017 WL 1397130 (S.D.Tex. 2017)("The ALJ may not ignore an [agency consulting expert's] opinion and must explain the weight it gives to their opinion."). Here, it is true, that in his written opinion, the ALJ does not discuss, or even acknowledge, that Dr. Brooks testified in this case. The Commissioner concedes that the ALJ's failure to consider Dr. Brooks' opinion is "contrary to the Social Security regulations," but argues, nonetheless, that it is harmless error. (Plaintiff's Response at 5-6). The court cannot agree.

Dr. Brooks determined that Plaintiff had the residual functional capacity to do only sedentary work. She could occasionally lift and carry objects weighing no more than ten pounds, and frequently lift and carry objects weighing less than ten pounds. (Tr. at 108). She could not stand or walk for more than two hours in an eight hour workday. (Tr. at 108). She could only occasionally use her hands and fingers to grasp and manipulate objects. (Tr. at 109). She could

never climb ladders, ropes or scaffolds. (Tr. at 109). If the ALJ had adopted those limitations, he would have limited Plaintiff to sedentary work.

Defendant argues that it was harmless to ignore that opinion, because the ALJ would have assigned little weight to it anyway. (Plaintiff's Response at 6). How the Commisioner can divine the ALJ's intentions in this regard is unknown. In any event, the Commissioner contends that the ALJ would have given Dr. Bentlif's opinion, that Plaintiff can do light work, more weight than that from Dr. Brooks, because it was better supported by the evidence and by Dr. Bentlif's testimony. (Plaintiff's Response at 6). The Commissioner also argues that the ALJ did, in fact, consider the substance of Dr. Brooks' opinion, because it is the same opinion offered by Dr. Harrell, and the ALJ rejected Dr. Harrell's opinion. (Plaintiff's Response at 6-7).

It is not a given, as Defendant insists, that the ALJ would have afforded Dr. Brooks' opinion little weight, or that Dr. Bentlif's opinion should be afforded greater weight. Neither Dr. Brooks, nor Dr. Bentlif, examined Plaintiff, but instead both consultants merely reviewed the medical records and the report from Dr. Isaac's examination. That places their opinions on an equal footing. Dr. Bentlif testified that Plaintiff can "occasionally" climb ladders, ropes and scaffolding, and can stand and walk for up to six hours in a work day. (Tr. at 136, 139). The evidence from Dr. Isaac's examination, however, shows that Childress has trouble balancing, and needs assistance in climbing, squatting, or standing from a crouch. (Tr. at 969-970). Dr. Bentlif also testified that Childress should be given the option to use a cane, but offered no explanation on how she can be expected to climb ladders, or walk and carry objects for up to six hours in a work day, if she uses a cane. Further, Dr. Bentlif's opinion that she can stand or walk for up to six hours in a day is directly contradicted by Dr. Isaac's statement that Plaintiff can walk for only

forty feet while carrying a five pound object.[10] (Tr. at 971). It is not apparent, at all, that Dr. Bentlif's opinion should be given "great weight," or even should be given more weight than Dr. Brooks' opinion.

If the ALJ had considered Dr. Brooks' opinion, he might have concluded that the limitations described by him were more consistent with the medical records, and with Dr. Isaac's examination, than those described by Dr. Bentlif. For instance, Dr. Isaac, in his report, said that Childress appeared to have "chronic pain," moved slowly, and needed assistance in climbing on the examination table. (Tr. at 969). He saw evidence of "moderate pain" in all of the joints of her fingers, elbows, shoulders and knees. (Tr. at 970). She was severely limited in her ability to bend, flex or rotate her spine. (Tr. at 970). She struggled with her balance during the tandem walk, and needed support to walk on her toes and heels, as well as to squat and to rise from a squat. (Tr. at 971). In addition, the medical records support Dr. Isaac's observations. Dr. Albuquerque stated several times that Plaintiff's fibromyalgia pain was not well controlled by medication. Childress repeatedly told Dr. Harrell that her fibromyalgia was "the same," and the pain medication was not effective. If the ALJ had properly considered Dr. Brook's testimony, and applied the appropriate test to decide what weight to give that testimony, the outcome in this case might well have been different. The ALJ's failure to consider Dr. Brooks opinion is not harmless error and requires a remand of this case.

### The ALJ Improperly Rejected the Opinions of Her Treating Doctor

Plaintiff also contends that the ALJ improperly rejected the opinions from her treating physician, Dr. Harrell, who has treated her since 2012. (Plaintiff's Motion at 7). Over a twenty-two month period, Dr. Harrell issued five separate opinions in which he said that Childress's

---

[10] The ALJ discounted this statement by Dr. Isaac because it "appears [to be] based on the claimant's subjective complaints." (Tr. at 65).

fibromyalgia, COPD, chronic back pain, and other conditions prevented her from standing or walking for more than thirty minutes at a time, and for more than two hours in a work day. (Tr. at 1724-1725, 1626, 1630, 1716, 890). The ALJ concluded, however, that Childress can stand or walk for up to six hours in a day. (Tr. at 61). In fact, all of Dr. Harrell's findings are in direct opposition to the ALJ's RFC determination. While the ALJ held that Childress could lift or carry 20 pounds occasionally and 10 pounds frequently, Dr. Harrell reported that she could lift or carry 10 pounds occasionally, and less than 10 pounds frequently. (Tr. at 61, 1626). The ALJ found that Plaintiff can "frequently" reach in all directions, handle, finger and feel with both hands. (Tr. at 61). Dr. Harrell reported that, because of her fibromyalgia, she can do those activities only ten percent of the time. (Tr. at 1726). Plaintiff argues that the ALJ erred, because Dr. Harrell is her treating physician and his opinions should be given controlling weight. (Plaintiff's Motion at 6-8).

In his written decision, ALJ Gutierrez addressed Dr. Harrell's RFC assessments, but assigned them "little weight." The law is clear that an ALJ cannot reject a treating source's opinion without identifying specific, legitimate reasons for doing so. *See Loza v. Apfel*, 219 F.3d 378, 395 (5th Cir. 2000); *Newton*, 209 F.3d at 453. In fact, the Fifth Circuit has repeatedly stated that, as a rule, "the opinions, diagnoses and medical evidence of a treating physician who is familiar with the claimant's injuries, treatment, and responses should be accorded considerable weight in determining disability." *Loza*, 219 F.3d at 395; *see Myers*, 238 F.3d at 621; *Greenspan*, 38 F.3d at 237. However, it is also true that "although the opinion of an examining physician is generally entitled to more weight than the opinion of a non-examining physician, the ALJ is free to reject the opinion of any physician when the evidence supports a contrary conclusion." *Bradley v. Bowen*, 809 F.2d 1054, 1057 (5th Cir. 1987) (quoting *Oldham v. Schweiker*, 660 F.2d 1078, 1084 (5th Cir. 1981)). And it is equally settled that an ALJ must

evaluate every medical opinion that is received on a claimant's behalf, and that he cannot reject

the opinion of a treating physician without "good cause" to do so. *See* 20 C.F.R. § 404.1527(d);

*Myers*, 238 F.3d at 621; *Loza*, 219 F.3d at 395; *Newton*, 209 F.3d at 455-56; *Greenspan*, 38 F.3d

at 237. "Good cause" may exist when the treating physician's statements are "brief and

conclusory, not supported by medically acceptable clinical laboratory diagnostic techniques, or

otherwise unsupported by the evidence." *Myers*, 238 F.3d at 621; *see Greenspan*, 38 F.3d at 237;

see also *Newton*, 209 F.3d at 456. But Fifth Circuit precedent is clear that:

> A finding that a treating source medical opinion is not well supported by
> medically acceptable clinical and laboratory diagnostic techniques or is
> inconsistent with the other substantial evidence in the case record means only that
> the opinion is not entitled to "controlling weight," not that the opinion should be
> rejected. Treating source medical opinions are still entitled to deference and must
> be weighed using all of the factors provided in 20 C.F.R. § 404.1527 and 416.927.
> In many cases, a treating source's medical opinion will be entitled to the greatest
> weight and should be adopted even if it does not meet the test for controlling
> weight.

*Id.* For that reason, a claimant is entitled to a remand if the ALJ rejects, or gives little weight to,

a treating doctor's opinion without properly considering each of the factors set out in the Social

Security regulations.[11] *See Myers*, 238 F.3d at 621; *Newton*, 209 F.3d at 456.

In this case, the ALJ's detailed his rationale for assigning little weight to Dr. Harrell's

first RFC assessment from September 2012, as set out below:

> "There are no treatment notes, no list of questions submitted to the claimant, nor
> any other medically acceptable clinical and laboratory diagnostic techniques
> attached to the Exhibit. This opinion is given little weight. At the time of his

---

[11] Those factors are as follows:
     (1) the physician's length of treatment of the claimant;
     (2) the physician's frequency of examination;
     (3) the nature and extent of the treatment relationship;
     (4) the support of the physician's opinion afforded by the medical evidence of record;
     (5) the consistency of opinion with the record as a whole; and
     (6) the specialization of the treating physician.
*Newton*, 209 F.3d at 456; *see* 20 C.F.R. § 404.1527(d)(2)-(6); *Myers*, 238 F.3d at 621.

opinion, Dr. [Harrell] had just started treating the claimant and his treatment notes failed to document any finding suggesting such severe limitations on her ability to lift, stand, walk, sit or perform fine manipulations."

(Tr. at 66). The ALJ then rejected the "headache" and "gastritis" questionnaires completed sixteen months later, because Dr. Harrell's treatment records "are not consistent with his lifting limitations and the claimant's inability to climb or sit, stand or walk for more than two hours. Dr. [Harrell] is not board certified in neurology nor gastroenterology." (Tr. at 67). The ALJ, similarly, gave little weight to the opinions in the fibromyalgia questionnaire Dr. Harrell completed, because he is "not board certified in rheumatology," and his treatment records are not "consistent with his lifting limitations and the claimant's inability to climb or sit, stand or walk for more than two hours." (Tr. at 67). The ALJ explained that Dr. Harrell's "opinion stands out in the record as the only medical opinion which suggests that the claimant is disabled." (Tr. at 67).

The ALJ's rationale is not persuasive. Dr. Harrell treated Plaintiff for almost two years. During that time, his description of her impairments, and her inability to stand and walk for long periods of time, remained consistent, which placed her at a sedentary level of work. The ALJ insists the "limitations imposed by Dr. [Harrell are] out of proportion with the medical evidence." (Tr. at 67). The evidence shows, however, that Plaintiff repeatedly complained to the rheumatologist, to Dr. Harrell and to Dr. Scobercea that her medications did not alleviate her fibromyalgia pain. (Tr. at 1358, 1404, 1423, 1445, 1462, 1495). She has had repeated injections in her right knee for pain. (Tr. at 1497, 1565). She has a reduced range of motion in her back, and has pain and tenderness in all of her joints. (Tr. at 970). Dr. Bentlif agreed that she should have the option to use a cane to walk. It is clear that there is evidence to support Dr. Harrell's opinion that Plaintiff is limited in her ability to walk for long periods of time.

The ALJ also discounted Dr. Harrell's opinions because he is not a specialist, but is only an internal medicine doctor. (Tr. at 66-67). Dr. Bentlif is not a neurologist or a rheumatologist, but he is also an internal medicine doctor. In that regard, his opinions should not be given greater weight than Dr. Harrell's, especially given that he has never examined Childress. The ALJ spent considerable time describing the opinions from Dr. Bentlif, Dr. Fritz, and Dr. Rowlands, the medical consultants acting on behalf of the state, to show that Dr. Harrell's opinion, that Plaintiff was limited to sedentary work, was an outlier. (Tr. at 67-68). However, it is not clear why the ALJ would determine that those consultants' opinions rebut Dr. Harrell's findings, when none of them actually examined Plaintiff, nor treated her on an ongoing basis as Dr. Harrell did. Nor is it accurate to say that Dr. Harrell's opinion stands alone. Dr. Brooks described the same level of impairment as did Dr. Harrell. As noted, the ALJ failed to even consider Dr. Brooks' testimony, and then used the absence of a corroborating opinion to reject Dr. Harrell's conclusion. The ALJ's error in this case was clearly prejudicial, because had he properly considered the evidence, he might have reached a different result. *See Newton*, 209 F.3d at 453; *Ripley*, 67 F. 3d at 557 n.22. In this case, remand is appropriate so that the ALJ can properly consider all of the evidence of record before reaching a decision on whether Childress is disabled. *See Myers*, 238 F.3d at 621; *Loza*, 219 F.3d at 395; *Newton*, 209 F.3d at 453-58.

It is worth noting, as well, the elusive nature of fibromyalgia. *See Benecke v. Barnhart*, 379 F.3d 587, 589-90 (9th Cir. 2004). The cause is unknown, there is no cure, and there are no laboratory tests to confirm the diagnosis. *Benecke*, 379 F.3d at 590 (citing *Jordan v. Northrop Grumman Corp.*, 370 F.3d 869, 872 (9th Cir. 2004); *Brosnahan v. Barnhart*, 336 F.3d 671, 672 n.1 (8th Cir. 2003)). Common symptoms of fibromyalgia, such as "chronic pain throughout the body, multiple tender points, fatigue, [and] stiffness" are largely subjective matters. See *id.* at 589-90 (citing *Brosnahan*, 336 F.3d at 672 n.1). The court in Benecke found that the "ALJ erred

43

by 'effectively requir[ing] "objective" evidence for a disease that eludes such measurement.'" *Id.* at 594 (quoting *Green-Younger v. Barnhart*, 335 F.3d 99, 108 (2d Cir. 2003)).

In this case, there is no dispute that Childress suffers from fibromyalgia, and that she has been treated for the condition, on a regular basis, for years. (*See*, e.g., Tr. at 1248-1576). The record is also replete with Plaintiff's subjective complaints of pain, and of the limitations that she ascribes to her condition. In his decision, however, the ALJ simply found that this evidence, and Dr. Harrell's opinion, was not supported by objective, medical findings. (Tr. at 68). The ALJ did not consult an expert on fibromyalgia, which the relevant regulations clearly permit him to do. *See* 20 C.F.R. § 404.919(a); *Turner v. Califano*, 563 F.2d 669, 671 (5th Cir. 1977) (quoting *McGee v. Weinberger*, 518 F.2d 330, 332 (5th Cir. 1975)). Or, given the elusive nature of fibromyalgia, the ALJ could ask a witness with expertise in such conditions to testify at a new administrative hearing. *See Richardson v. Perales*, 402 U.S. 389, 400 (1971). On remand, the ALJ should give due consideration to the evidence, including the subjective evidence, on fibromyalgia, and consult with appropriate experts, before he can make a decision that is truly supported by substantial evidence. *See Ripley*, 67 F.3d at 555; *Wren*, 925 F.2d at 126; *Johnson*, 864 F.2d at 343.

### *Conclusion*

The ALJ erred when he failed to consider or weigh the testimony of Dr. Brooks. The ALJ further erred when he assigned "little weight" to the opinion for Dr. Harrell, without adequately explaining a legitimate rationale for that weight. "[W]here the rights of individuals are affected, an agency must follow its own procedures, even where the internal procedures are more rigorous than otherwise would be required." *Newton*, 209 F.3d at 459. If an agency fails to follow those procedures, and "[i]f prejudice results from the violation," then "the result cannot stand." *Id.* In social security cases, a claimant establishes prejudice by showing that, absent the

errors, the ALJ might have reached a different conclusion. *See id.* In this case, Childress was prejudiced, because if the ALJ had followed procedure—including properly treating the opinions of her treating physicians, and considering all of the medical opinions—he might have reached a different result. *See id.* Because the ALJ failed to follow SSA procedures, his decision is not supported by substantial evidence, and is subject to reversal. *See id.* at 452; *Ripley*, 67 F.3d at 557 & n.22. Consequently, the court finds that this matter should be remanded, under sentence four of 42 U.S.C. 405(g), so that the record can be developed fully, and to allow the ALJ to render a decision that is supported by substantial evidence.

Accordingly, it is **ORDERED** that Plaintiff's Motion for Summary Judgment is **GRANTED**, and that Defendant's Motion for Summary Judgment is **DENIED**.

It is further **ORDERED** that the SSA's final decision is **REVERSED** and **REMANDED**, under sentence four of 42 U.S.C. 405(g), with instructions that an ALJ further develop the record, and consider the evidence further as set out in this memorandum.

This is a **FINAL JUDGMENT**.

The Clerk of the Court shall enter this order and provide a true copy to all counsel of record.

SIGNED at Houston, Texas, this 3[d] day of October, 2017.


**MARY MILLOY**
**UNITED STATES MAGISTRATE JUDGE**